## IN THE UNITED STATES FEDERAL DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **BRENDAN ABBOTT,** *individually and on behalf of all others similarly situated,* | **Case No. 22-CV-00587-CDP** |
| **Plaintiffs,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **VITAL PHARMACEUTICALS, INC.,** d/b/a "VPX Sports," and DOES 1 through 10, | |
| **Defendants.** | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Brendan Abbott, individually and on behalf of all others similarly-situated hereby files this, his First Amended Class Action Complaint, against Defendant Vital Pharmaceuticals, Inc., *doing business as* "VPX Sports," and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products, constituting breach of warranty, breach of implied contract, and unjust enrichment on a nationwide basis and, in the State of Missouri, in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

## I.     INTRODUCTION

1.     Defendant VPX Sports markets and sells different health-related products to Missouri citizens, including supplements, energy drinks and protein bars.  One of VPX Sport's most-popular products is a line of "energy shots" sold under the brand name "Bang."  The "Bang" Energy Shot is a drinkable liquid packaged in a 3fl oz. plastic bottle that claims to contain "Potent Brain and Body Fuel."

2.     The "Bang" line of products is deceptively and misleadingly marketed as containing "SUPER CREATINE."  Creatine is a very popular supplement among athletes and bodybuilders that has proven benefits, helping users to gain muscle, enhance strength, and improve exercise performance.

1

3.      However, despite claiming to contain "SUPER CREATINE," the "Bang" product contains no creatine whatsoever; "SUPER CREATINE" is *not* creatine.  Instead, what VPX Sports deceptively and falsely claims to be "super" creatine is in fact a wholly different substance, "creatyl-l-leucine." ("CLL").

4.      CLL is a substance unique to VPX Sports and to the "Bang" product.  Defendant claims the substance is "creatine bonded to L-leucine."  If that is the case, the substance is not creatine. Two chemical compounds "bonded" together form a wholly unique substance.

5.      More importantly, as shown herein, ***multiple scientific studies*** have established that CLL is ***not*** creatine, and has no creatine-like effects whatsoever.  Indeed, even VPX Sports' own experts have admitted as much.

6.      For that reason, Defendant's further listing "creatine" in brackets following "SUPER CREATINE" in the "Ingredient" portion of the product's labeling is also deceptive to an average consumer.  Because of the chemical bonding that occurs, from a scientific standpoint, "SUPER CREATINE" is not creatine. It is CLL, which has zero creatine-like effects.  Yet an average consumer does not necessarily know as much, which renders Defendant's listing "creatine" for a second time in the "Ingredients" section doubly deceptive to a normal consumer.

7.      In short, "SUPER CREATINE" is not creatine, and the "Bang" products contain no creatine.  By nonetheless using the "SUPER CREATINE" label on the "Bang" product – and by confusingly listing "creatine" under the "Ingredients" portion of the label – Defendant VPX Sports is knowingly deceiving consumers. Creatine has multiple proven physiological benefits; "creatyl-l-leucine" does not.

8.      In this fashion, VPX Sports sells the product to the buying public, misleading and deceiving consumers into paying for an inferior product while under the false impression that it has benefits that it does not contain.

2

9.      Pursuant to the MMPA, such practice is illegal.

10.     In addition and/or in the alternative to the above, since the initial offering of the Product, each and every container of the Product has borne a uniformly-worded label falsely claiming the Product contains "SUPER CREATINE."  That uniformly-worded false statement gives rise to additional and/or alternative claims under Missouri law.

## II.      PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff Brendan Abbott is a citizen and resident of St. Louis County, Missouri.

12.     Plaintiff brings this Class Action Complaint individually and on behalf of a putative nationwide class of all United States consumers and, additionally or alternatively, a putative class of Missouri residents.

13.     Defendant Vital Pharmaceuticals, Inc. ("VPX Sports") is a Florida Corporation that has its principal place of business at 1600 North Park Drive, Weston, Florida 33326.

14.     Defendant VPX Sports advertises, distributes, markets and sells the "Bang" line of products deceptively and misleadingly marketed as containing "SUPER CREATINE" and having "Natural Flavors."

15.     The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein.  If necessary, Plaintiff will seek leave of Court to amend the Petition to reflect the true names and capacities of the DOE Defendants when such identities become known.

16.     Venue is proper in this Court because Plaintiff was injured in this venue and lives within this venue.

17.     This asserted class action comports with Missouri Supreme Court Rule 52.08 and with R.S.Mo. § 407.025(3) of the MMPA.  Plaintiffs' identities can be ascertained from Defendant's records,

but are so numerous that simple joinder of all individuals is impracticable.  This action raises questions of law and fact common among Plaintiffs.  The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

18.    <u>Class definitions</u>:  Plaintiff Brendan Abbott brings this action on behalf of himself and a nationwide class of similarly-situated persons preliminarily-[1]defined as follows: All persons who purchased "Bang" products (the "Product")[2] during the Class Period in the United States. In addition, and/or alternatively, Plaintiff Brendan Abbott brings this action on behalf of himself and a Missouri subclass of similarly-situated persons defined as follows: All persons, who, within the Class Period, purchased the Product in the State of Missouri.   The Class Period begins five years prior to the date of the filing of this Petition, and ceases upon the date of the filing of this Petition.  Excluded from the Class and Subclass are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers and directors; (c) employees (i) who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

19.    <u>Numerosity</u>:  Upon information and belief, the Class and Subclass includes a few

---

[1] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification.
[2] As that term and label is defined in greater detail *infra.*

thousand individuals on a statewide basis, making their individual joinder impracticable.  Although the exact number of Class members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendants' records.

20.     Typicality: Plaintiff's claims are typical of those of the Class and Subclass because all Plaintiffs were injured by the Defendants' uniform wrongful conduct, specifically, using misleading and deceptive marketing and advertising in offering and selling the Product to Plaintiffs.

21.     Adequacy:  Plaintiff is an adequate representative of the Class and/or Subclass because his interests do not conflict with the interests of the Class or Subclass members he seeks to represent, he has retained competent and experienced counsel, and he intends to prosecute this action vigorously.  The interests of the Class and Subclass will be protected fairly and adequately by Plaintiff and his counsel.

22.     Commonality:  Common questions of law and fact exist as to all Class and Subclass members and predominate over any questions affecting only individual members, such as: (a) whether the Defendant used deceptive or misleading marketing and advertising in selling the Product; (b) whether and to what extent the Class members were injured by Defendant's illegal conduct; (c) whether the Class members are entitled to compensatory damages; (d) whether the Class members are entitled to declaratory relief; and (e) whether the Class members are entitled to injunctive relief.

23.     Superiority:  This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's wrongful conduct.  Thus, it would be extremely difficult for the individual Class members to obtain effective relief.  A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

### III.   **BACKGROUND**

24.      Defendant manufactures, distributes, and/or sells the product at issue herein, "Bang"-branded "Energy Shots" described as "Potent Brain and Body Fuel" and purportedly containing "SUPER CREATINE" (the "Product").

25.      Defendant VPX Sports, in particular, owns the "Bang" brand and, under that brand name, manufactures and distributes, *inter alia,* the Product.

26.      The Product is marketed as purportedly being "potent brain and body fuel," and containing, *inter alia,* "SUPER CREATINE."

27.      The packaging of the Product, regardless of its flavor or color, makes the same uniform claim, that it contains "SUPER CREATINE":



a.

28.      As shown, the Product, regardless of flavor or color of packaging, uniformly claims to contain "SUPER CREATINE."

29.      In addition, the Product, on the back side of each canister, provides as follows:



a.

30.     As shown, along with multiple other ingredients, "SUPER CREATINE" is listed in prominent, bold lettering under the "INGREDIENTS" heading on the label on the back side of the Product.  Following that, in brackets, the label confusingly lists "creatyl-l-leucine (creatine bonded to l-leucine)."  Even though "creatyl-l-leucine" ("CLL") is a wholly unique substance from creatine, the average consumer would not know this and would instead be doubly deceived by yet another confusingly deceptive listing of "creatine" under the "Ingredients" portion of the product's label.

31.     In short, on both the front and back of the Product, the Product expressly claims to contain "super" creatine.  The Product's confusing "explanation" of "SUPER CREATINE" only further confuses a consumer into believing the Product contains creatine.

32.     In all events, it is irrefutable that the Product does not, in fact, contain any creatine.

33.     And, unlike creatine, which has well-established and scientifically-proven physiological benefits, creatyl-l-leucine has no proven benefits whatsoever, and **has been scientifically proven to have *no creatine-like* benefits.**

7

***"Super Creatine" is Not Actual Creatine, and Does Not Raise the Body's Creatine Levels***

34.     As noted, the Products' "Super Creatine" is actually "creatyl-l-leucine" ("CLL")**.** Portraying CLL as creatine (in any respect, "Super" or otherwise) is deceptive because Defendant's own scientists admit that CLL is ***not*** creatine, and has none of creatine's benefits.

35.     Recently, some of the very same questions that this lawsuit poses – such as, whether Defendant's portraying "Super Creatine" as creatine is deceptive – were raised in a lawsuit between Defendant VPX Sports and its chief competitors, Monster Energy and Orange Bang.

36.     That lawsuit, filed by VPX Sports against Monster Energy, was filed in the United States District Court for the Central District of California (*VPX Sports v. Orange Bang, Inc. et al.* Case No. 5:20-cv-1464)("*Orange Bang*").

37.     Shortly after it was filed, the *Orange Bang* lawsuit was sent to arbitration and – after the parties spent millions of dollars on expert witnesses – recently was resolved by the arbitrator, who found that VPX Sports owed Monster Energy and Orange Bang $175 million for violating "Bang" trademark rights.[3]  A redacted copy of the arbitrator's April 4, 2022, "Final Arbitration Award – Phase 1 and Phase 2" ("Arbitration Award"), made publicly-available through that lawsuit, is attached hereto as **Exhibit A** (also available at *Orange Bang,* Doc. 58-2).

38.     In making the award, the arbitrator ("Arbitrator") came to conclusions and recited findings that make it abundantly and indisputably clear that even Defendant's ***own experts*** agree that the Products' "Super Creatine"/CLL is *not actual creatine and does not raise the body's creatine levels.* <u>*Arbitration Award,*</u> at 51-58 of 178.

39.     Specifically, the Arbitrator sought to resolve the stated question: "Whether or not CLL is

---

[3] *See, Reuters, "Monster ask court to enforce $175M award against Bang Energy maker,* available at: https://www.reuters.com/legal/legalindustry/monster-asks-court-enforce-175-mln-award-against-bang-energy-maker-2022-04-06/

8

creatine and whether or not a product with CLL meets the 'creatine-based' standard…" *Arbitration Award,* at p. 52. In answering those questions, VPX Sports' creatine expert, Guillermo Escalante ("Escalante"), made "significant admissions" that "[could] only be characterized as **stunning** and not helpful in advancing VPX Sports position." *Id.* at 51 (emphasis in original). Amongst the admissions made by Defendant's own expert, Escalante, were the following:

    a.  Escalante "did not testify that CLL is a form of creatine"; (*Id.* at 52)*,* citing Escalante testimony)

    b.  "Escalante testified that based on the scientific studies conducted on CLL to date, there is ***no evidence to support the efficacy of CLL*.**" *Id.* at 52 (emphasis added);

    c.  "Escalante testified that in order for a substance to be deemed creatine, it would need to increase muscle creatine levels in the human body," but that "he ***cannot say that CLL increases muscle creatine levels*.**" *Id.* at 53 (emphasis added);

    d.  "Escalante testified that ***he has no evidence*** that CLL has the same biological function of creatine." *Id.* at 53 (emphasis added);

    e.  "Escalante testified that … ***he has no evidence*** that CLL increases blood creatine level at all." *Id.* at 53 (emphasis added);

    f.  "Escalante testified that although [creatine] is beneficial to increase muscle mass, he cannot say that CLL increases muscle levels of creatine because ***he has no evidence*.**" *Id.* at 53 (emphasis added);

    g.  "Escalante testified that he cannot say that CLL has the physiological or the psychological (beneficial) effects similar to [creatine] because ***he has no evidence*.**" *Id.* at 54 (emphasis added);

h. "Escalante testified that he himself would not drink [the Products] alone in order to get the benefits of creatine." *Id.* at 54 (emphasis added).

40.     Finally, in what the Arbitrator characterized a "dispositive admission," Defendant's own expert, Escalante, testified that "based on current available evidence, and speaking as a scientist, it is ***not reasonable*** for VPX to advertise [the Products] as a source of creatine, or for VPX to advertise CLL or super creatine as a source of creatine." Exhibit A, *Arbitration Award,* at 54 (emphasis added).

41.     In short, as the Arbitrator duly noted, "Escalante has admitted that there is zero evidence to support the contention that CLL delivers the efficacious benefits of creatine to the human body." *Id.*

42.     Based on that testimony and other evidence, the Arbitrator concluded that Defendant's products, including the Products here, are not "creatine-based."  For the same reasons, the Products' claims to contain not just creatine, but "Super Creatine" are extremely deceptive.

43.     In addition to the above evidence, the Arbitrator also pointed out that Monster/Orange Bang's expert, Dr. Nathan Gianneschi, also testified that:

a. CLL does not contain the creatine molecule;

b. Because CLL compounds do not contain the creatine molecule, they are, as a matter of chemistry, not creatine;

c. Additionally, CLL compounds are not creatine because they do not increase the body's creatine levels. Exhibit A, *Arbitration Award,* at 55 (emphasis added).

***Multiple Scientific Studies Prove that "Super Creatine" Does Not Increase Creatine Levels***

44.     In addition to the testimony of Defendant's very own expert, multiple scientific studies have illustrated that Defendant's "Super Creatine"/CLL does not increase creatine levels in the human body whatsoever.

45.     For example, one of the multiple studies finding that CLL has no creatine-like effects is a

February 2022 study entitled: *The Dietary Supplement Creatyl-l-Leucine Does Not Bioaccumulate in Muscle, Brain or Plasma and is Not a Significant Bioavailable Source of Creatine,* by Robin P da Silva.[4]

46.    In the *DaSilva* study, the author dosed different groups of creatine-deprived rats with CLL and with creatine for a one-week period.  The author concluded that CLL supplementation results in "no bioaccumulation of either CLL or creatine" in the rats' blood, muscles and/or brains.[5]  In other words, CLL is not creatine and has no creatine-like effects as a dietary supplement.

47.    Multiple other studies have reached similar conclusions.  As the Arbitrator in the *Orange Bang* lawsuit pointed out, at least four separate human and animal studies that have assessed whether CLL raises creatine levels, produced the same conclusions: CLL does not raise creatine levels and otherwise *has no effect*:

> a.    "KGK Science Study" – showed "no measurable increase in creatine levels of the blood by virtue of CLL"[6]:
>
> b.    "Da Silva Study" (cited above) – showed "no measurable increase in creatine levels of rats in their blood, muscles or brain by virtue of CLL";
>
> c.    "Ostojic Study" – "showed no measurable increase in creatine levels in the muscles or the brain by virtue of CLL";
>
> d.    "Burd Study" – "showed no measurable increase in creatine levels in the muscles by virtue of CLL."

Exhibit A, *Arbitration Award,* at 55-56 (emphasis added).

48.    After reviewing the results of those studies, "performed by highly-regarded researchers," even VPX Sports' own experts agreed with the "conclusion that CLL does not create an efficacious effect in the human body like creatine." *Id.*

---

[4] Available at: https://pubmed.ncbi.nlm.nih.gov/35277060/ (last visited May 11, 2022).
[5] *Id.*
[6] The "KGK Science Study," is outlined in detail *infra.*

49.    Going even further, the "experts all agree[d] that [the Products] *do not have a sufficient amount of purported creatine in them in any event* [to have any effect]; [as] [b]oth sides agree[d] that the minimum effective daily dosage of creatine is 3,000-5,000 mg per day." *Id.* at 57 (emphasis added).

50.    In other words, even if CLL *did* provide the same benefits as creatine (which it clearly does not), there is not enough of it in the Products to have any actual effect for a consumer.

51.    In addition to the evidence revealed through the *Orange Bang* arbitration, in another lawsuit filed in the Federal District Court for the Central District of California, *Monster Energy Company v. VPX Sports, et. al.,* 18-cv-1882-JGB ("*Monster Energy*"), similar and more-detailed evidence was presented.

52.    Among other materials recently made public in that litigation were exhibits offered in support of Monster Energy's Motion for Partial Summary Judgment, filed in the *Monster Energy* case in June of 2021.

53.    One important exhibit is the "Statistical Analysis Report" describing and summarizing the aforementioned "KGK Science Study," which was a "randomized, double-blind, crossover study to investigate the pharmacokinetics of creatine monohydrate and creatyl-L-leucine in health adults," reported on March 17, 2021. Exhibit B, "KGK Science Study." (publicly-available at Doc. 434-46 in *Monster Energy*).

54.    As noted above, the KGK Science Study results established *no measurable* increase in blood creatine levels by healthy adults ingesting CLL. *See id.,* Exhibit B at pp. 9-12.

55.    Also published in the *Monster Energy* lawsuit is the "Report and Analysis" completed by Robin da Silva in relation to the aforementioned "DaSilva Study." Exhibit C, "DaSilva Report and Analysis," (publicly-available at Doc. 434-49 in *Monster Energy*). The DaSilva Report explains in more detail the underlying experiment conducted (mentioned *supra*) to determine that "[n]o significant changes were detected in arterial plasma, portal venous plasma, and muscle after dietary CLL

supplementation compared to controls." *See id.,* Exhibit C, at "Page 1200" ("Overall Conclusion").

56.     In addition to the details in the KGK Science and Da Silva studies, the details of the aforementioned "Ostojic Study," are available through the *Monster Energy* docket; as displayed in its "Final Report," the "Ostojic Study" refers to a research project conducted by Professor Sergij M. Ostojic, entitled "Effects of supplemental creatyl-L-leucine on brain creatine levels and safety biomarkers in healthy young men." Exhibit D, (publicly-available at Doc. 434-50 in *Monster Energy*).

57.     As described in the Ostojic Report, a group of healthy young males was dosed with either CLL or placebo over a 28-day intervention period. *Id.,* Exhibit D, at 2 ("Methods").

58.     After measuring the results, the Ostojic Study concluded that "a 28-day supplementation with CLL provoked *no statistically significant effects on brain and skeletal muscle creatine levels* in healthy young men, with CLL impact *equivalent to placebo*." *Id.,* Exhibit D, at 2 ("Conclusion")(emphasis added).

59.     Additionally, the *Monster Energy* litigation also publicized the aforementioned "Burd Study," which was entitled "Effect of dietary supplementation on muscle creatine." Exhibit E, "Burd Study Report" (publicly-available at Doc. 434-51 in *Monster Energy*).

60.     As previously noted, and as relayed in the Burd Study Report, the Burd Study used a "randomized, double-blind, placebo-controlled, parallel design to assess the effectiveness of [CLL] supplementation for increasing muscle creatine content." *Id.,* Exhibit E, at 4 ("Experimental Design").

61.     As the Report illustrates, the Burd Study showed no measurable increase in creatine levels in the muscles or the brain by virtue of CLL; "[t]here were no differences observed between groups for any of the baseline characteristics analyzed." *Id.* at p.3 ("Table 1"), p. 10 ("Results").

62.     Finally, in addition to all of the above studies, the *Monster Energy* litigation publicized a study sponsored by Monster Energy itself, conducted by Biofortis Innovation Services, entitled:  A Single-Blind Randomized, Crossover Study to Examine the Effect of a Commercially Available Energy

Drink on Circulating Creatine Levels in Healthy Adults ("Biofortis Study") <u>Exhibit F,</u> (publicly-available at Doc. 434-133 in *Monster Energy*).

63.    After conducting a multi-day, multi-subject study, and rigorously examining the data, Biofortis also concluded that consumption of 32 oz. of [the Product] *did not affect plasma creatine and creatine ... when compared to a negative control drink containing 0 mg creatine."* <u>Exhibit F,</u> at 27 ("Summary")(emphasis added).

64.    In other words, the Biofortis Study, like all four of the aforementioned studies and VPX Sports' own expert, concludes that CLL is not creatine, and produces no creatine-like effects. *Id.*

### *Science Has Established that CLL is <u>Not</u> Creatine, and Produces No "Creatine-Like" Effects*

65.    As shown above, through at least **five** separate studies, it has been conclusively established that "CLL" is *not* creatine, and has zero "creatine-like" effects.

66.    For all of those reasons set forth above and herein, VPX Sports' very use of the term "SUPER CREATINE" is misleading, deceptive, and unfair.

67.    VPX Sports' claims that the Product contains "SUPER CREATINE" are patently deceptive and misleading because the Product contains no creatine and the purported-creatine-substitute CLL has no creatine-like effects.

68.    Because creatine is scientifically-proven to provide beneficial physiological effects, consumers purchase the Product specifically because it claims to contain creatine.

69.    If not for the false claim that the Product contains creatine, VPX Sports would not sell as much of the Product as it does, in Missouri or throughout the United States.

70.    Upon information and belief, Defendant VPX Sports profits from the wide-spread practice of selling a Product that does not actually contain the ingredients it purports to contain.

71.    Defendant's marketing and selling of the Product by use of the aforementioned false, deceptive, and misleading statements is illegal and prohibited under the laws of the fifty states, along

with the MMPA and Missouri common law.

*Allegations Relating Specifically to Claims of the Nationwide Class*

72.     As noted, *supra,* since the initial offering of the Product, each and every container of the

Product has borne one or more uniformly-worded labels falsely claiming the Product contains "SUPER

CREATINE" (hereinafter "False Claims").

73.     In reality, testing and usage of the Product reveals the falsity of the False Claims; the

Product does not contain creatine, and "Super Creatine" is not creatine and has no creatine-like effects.

74.     Defendant, as developer, manufacturer, and exclusive seller and distributor of the

Product, has been aware since the Product's inception, that the False Claims are in fact false.

75.     Defendant undoubtedly did its own testing of the Product prior to it being offered for sale

and, of necessity, such testing would have made Defendant aware that the Product contains no creatine.

76.     Indeed, as displayed above, it has been scientifically established that CLL is not creatine

and has no creatine-like effects – "SUPER CREATINE" is patently deceptive.

77.     Despite this, Defendants purposely made the False Claims in order to induce the false

belief in consumers that they were purchasing a product that contained creatine, and thus would provide

the physiological benefits of creatine.

78.     Plaintiff and the class members purchased the Product with no reason to suspect or know

that the Product does not contain creatine.

79.     Defendant possessed specialized knowledge regarding the data and information

concerning the formula of the Product and whether the Product did in fact contain creatine.

80.     In fact, in regard to the False Claims, the Product is a credence good because its

purported creatine benefit cannot be independently assessed or verified by the consumer at the time of

purchase.

81.     In purchasing the Product, Plaintiff and the class members had no choice but to

necessarily and justifiably rely upon the False Claims as accurate.

82.     Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Product or would not have paid as much for the Product.

83.     If, at some point in the future, the Product was improved to actually contain creatine, Plaintiffs might then purchase the Product again.

84.     As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant.

85.     By marketing, selling and distributing the Product to purchasers in Missouri, Defendant made actionable statements that the Product contained creatine and at all times failed to disclose that the Product did not in fact contain creatine, and "SUPER CREATINE" is not creatine and has no creatine-like effects.

86.     Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

87.     Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

88.     As the distributor, marketer, producer, manufacturer, and seller of the Product, Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Product which the Plaintiff and the class members could not and did not review.

89.     All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

*Facts Particular to Brendan Abbott*

90.     In or around April of 2022, Plaintiff purchased the Product from a third-party retailer while in Missouri.

91.     Due to the claims on the packaging, Plaintiff falsely believed he was purchasing a product that contained creatine.

92.     Plaintiff thereafter purchased the Product.  He purchased the Product primarily for his personal, family and household use, and personally used the Product (by ingesting it).

93.     At the time he purchased the Product, Plaintiff was unaware of the falsity of the Product's claims.

94.     He discovered that such claims were false shortly after purchasing and ingesting the Product in September.

95.     If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, he would not have bought the Product.

96.     When Plaintiff purchased the Product, he was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

97.     Specifically, Plaintiff suffered an ascertainable loss because he did not receive the expected benefit of his bargain.

98.     When Plaintiff was purchasing the Product, due to the false claims upon the Product, Plaintiff believed that he was receiving a product that contained creatine, and thus would provide the physiological benefits of creatine.  The Product did not do what Plaintiff bargained for, however; it contained no creatine and conferred none of its benefits.

99.     The Product was not what it was purported to be.  Plaintiff did not receive the value of what he bargained for; instead Plaintiff received a product that contained none of its most-prominently advertised ingredient.

100.    Consequently, Plaintiff was damaged in the amount of the difference between the cost paid for the Product as represented – as one that contained creatine – and the actual value of the product without creatine.  Said difference would therefore be a percentage of the price paid for the Product.

101.    Plaintiff would purchase Defendant's Product again if Defendant could cure the above defects, but Plaintiff faces an imminent threat of harm because Plaintiff will not be able to rely on the labels in the future, and thus will not be able to purchase the Product.

102.    Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed Class, all that is relevant is that Plaintiff and the class members, Missouri citizens, purchased the Product at a time within the Class Period while in Missouri.

## CAUSES OF ACTION

### COUNTS RELATING TO THE NATIONWIDE CLASS

### COUNT ONE: BREACH OF WARRANTY

103.    Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition.

104.    Defendant sold the Product in its regular course of business.  Plaintiff and the class members purchased the Product.

105.    Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims.

106.    The False Claims became the basis of the bargain between the Defendant and Plaintiff and each class member.

107.    Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

108.    Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty under Missouri law.

18

109. Defendant breached the warranty because the False Claims were false – the Product in fact contains no creatine and provides no creatine-like benefits.

110. The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

111. All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the Product.

112. Defendant had actual notice of the false labeling information and to date has taken no action to remedy its breach of express and implied warranty.

113. Specifically, on September 16, 2021, counsel for Plaintiff provided written NOTICE of Defendant's breach of express warranty to Defendant directly and to Defendant's legal counsel in another lawsuit. Despite receiving such correspondence, Defendant has not meaningfully responded, and has taken no action to remedy its breach of express and implied warranty.

114. In addition, Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, inter alia, Defendant's testing and use of the Product.

115. Defendant has nonetheless refused to remedy such breaches.

116. By placing the Product in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products were accurately labeled in conformance with the law.

117. Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid. As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages.

118. As a result of Defendant's breach of these warranties, Plaintiff and class members are

entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relied as deemed appropriate, in an amount sufficient to compensate them for not receiving the benefit of their bargain.

## COUNT TWO: BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE)

119.    Plaintiff repeats and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

120.    By operation of law, there existed an implied contract for the sale of the Product between Defendant and Plaintiff and each class member who purchased the Product.

121.    By operation of Missouri law, there existed an implied duty of good faith and fair dealing in each such contract.

122.    By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

123.    As a result of that breach, Plaintiff and each class member suffered damages.

## COUNT THREE: UNJUST ENRICHMENT

124.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

125.    Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

126.    Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

127.    Defendant either knew or should have known that the payments rendered by Plaintiff and the class members were given and received with the expectation that the Product would be as represented and warranted.  For Defendant to retain the benefit of the payments under these circumstances is inequitable.

20

128.    Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Products, including the False Claims, Defendant reaped benefits, which result in Defendant wrongfully receiving profits.

129.    Equity demands disgorgement of Defendant's ill-gotten gains.    Defendant will be unjustly enriched unless Defendant is ordered to disgorge the unjustly obtained portion of profits for the benefit of Plaintiff and the class members.

130.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

COUNTS RELATING TO THE MISSOURI SUBCLASS

**COUNT FOUR: VIOLATION OF THE MMPA – Misleading, False, and Deceptive Marketing**

131.    Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this First Amended Complaint, as though fully set forth herein.

132.    Defendant's acts complained of herein occurred in and emanated from the State of Missouri.

133.    Plaintiff and all members of the Class are "persons" and the Product is "merchandise" as those terms are defined under the MMPA.

134.    As set out in this Petition, Defendant's marketing of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

135.    As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Product they were purchasing contained creatine.

136.    Defendant's deceptive acts caused Plaintiff and the Class Members an ascertainable loss within the meaning of the MMPA.  In particular, Plaintiff and the class paid for a Product that did not, in fact, contain creatine.

137.    Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

138.    Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order certifying this action as a Nationwide class action, along with a Missouri subclass, and appointing Plaintiff Brendan Abbott as Class and Subclass representative and his counsel as class counsel.  Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned nationwide claims; and/or violated the MMPA, and award Plaintiffs compensatory damages, restitution, attorneys' fees, punitive damages, costs, and such further relief as the Court deems just, including injunctive relief.

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: */s/ Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*